PETTIGREW, J.
LMarsha O’Neal, a former registered nurse with the Department of Health and Hospitals, Office of Public Health, appeals a State Civil Service Commission decision, denying her appeal and rendering final a decision by the Referee, finding her job termination was supported by evidence of disruptive behavior in the workplace and insubordination (leaving work without authorization). After a thorough review of the record, as well as the arguments raised by the appellant, we affirm.
The Assignments of Error raised by the appellant are, as follows.
1. The trial court[1] erred when it made a pretrial ruling that the Appellant did not timely appeal the State layoff and reallocation plan where the record shows that she did.
2. The trial court erred in not finding that the Appellant’s supervisor Avis Gray violated Civil Service Rule 10.6(3) where the record shows that she gave Appellant a “poor” performance rating but failed to supply any documentation even after the Appellant requested it.
3. The trial court erred when it did not consider any of the testimony of the Appellant’s witnesses nor any other evidence presented by Appellant that clearly showed that she had been verbally and physically attacked by her accusers prior to their false statements about her behavior at the work place.
4. The trial court erred when he ruled that the Appellant failed to report to work on May 19, 2011 without approval where the record shows that her supervisor rescinded her first denial of leave for May 19, 2011 and left the decision concerning leave for May 20, 2011 to be made by the floor supervisor who granted the Appellant leave.
5. The trial court erred when it did not find that the Appellant’s supervisors and coworkers retaliated against her when she cited them for improper *1240 behavior for demoting her and for firing her as soon as one day after she told her supervisor that she was applying for disability retirement.
IsFACTS AND PROCEDURAL HISTORY
Notwithstanding any argument raised by Ms, O’Neal, with the exception of Ms. O’Neal’s contrary accounts, the otherwise uncontradicted evidence submitted by the parties established the occurrence of the following incidents, on which Ms. O’Neal’s ultimate termination was based. On April 6, 2009, while Ms. O’Neal was working at DHH’s Marrero Health Clinic, as a Public Health Nurse 5, Ms. O’Neal became angry when she was approached by Lisa Davis, Administrative Supervisor 2,[2] with a request to approve a leave request submitted by one of Ms. O’Neal’s supervisees. Ms. O’Neal angrily accused Ms. Davis of trying to “drive a wedge” between the nurses and Ms. O'Neal. Ms. O’Neal got very close to Ms. Davis’s face while Ms. Davis was on the telephone and repeatedly yelled that she was a “liar.” Ms. Davis testified at the hearing that Ms. O’Neal became “really enraged” and that things got “really ugly” when she asked Ms. O’Neal to sign a leave request so that a payroll deadline could be met. In an email dated the next day that she was asked to turn in to their supervisor, Dr. Takeisha Davis, Ms. Davis reported the incident as described above and stated that Ms. O’Neal often treats her with disrespect, and that she makes statements that cause conflict within the staff.
The next documented incident upon which Ms. O’Neal’s termination was partly based occurred on March 25, 2010. This incident also involved Ms. O’Neal and Lisa Davis, but also involved Ms. Rosalind Hawkins, supervisor of Ms. Davis, who was seated at a desk next to Ms. Davis at the time. Ms. Hawkins was very familiar with Ms. O’Neal and described her general behavior in the workplace as “loud,” “aggressive,” and often times “threatening.” On March 25, 2010, Ms. O’Neal came into Ms. Davis’s office “outraged, angry, and agitated” stating that her printer was not working properly and demanding that Ms. Davis fix it right away. Ms. Davis testified that she explained to Ms. O’Neal that she was currently working on a report that had to be finished and that she could not stop at that immediate moment. She testified that she offered Ms. O’Neal several alternative suggestions on how to print what she needed in the meantime, and that she would tend |4to the problem with Ms. O’Neal’s printer as soon as she could. Ms. Davis stated that the entire time Ms. O’Neal was in her office complaining of the printer, she was either sitting intimidatingly close to Ms. Davis, or standing inches beside her in a threatening manner. Apparently, Ms. O’Neal found someone else who was able to get her printer working, because she then returned back to Ms. Davis’s office, infuriated and in a “rage,” going on and on about Ms. Davis’s refusal to help her. Ms. Davis testified that she felt threatened, was extremely frightened there would be a fight, and that she did her best to ignore Ms. O’Neal until she finally left the office. That incident occurred on a Thursday. When Ms. O’Neal returned on Monday, she continued to “harass” Ms. Davis about the printer. At this time, Ms. Davis stated she decided to write a written statement, which she intended to turn in as a grievance against Ms. O’Neal because she “had had enough.” She further described Ms. O’Neal as verbally abusive, “combative, defensive, offensive, and rude.” She also noted that on more than *1241 one occasion, Ms. O’Neal threatened to “take her to court.” Ultimately, she noted that she was frightened of Ms. O’Neal and did not wish to work with her any longer.
Following the foregoing incident, Ms. O’Neal and Ms. Davis met with Mary Triggs, the Facilities Manager and supervisor of Ms. Davis. However, Ms. Davis stated that she left the meeting shortly after it began, against the wishes of her supervisor, because she was unable to speak. Ms. Triggs asked Ms. O’Neal for her version of events, then when it was Ms. Davis’s turn to speak, Ms. O’Neal began to repeatedly and incessantly call her a liar. Feeling nothing would get accomplished at the meeting, Ms. Davis left.[3]
On May 24, 2010, Ms. O’Neal submitted an application for disability retirement benefits to Avis Gray, as the Region 1 Public Health Regional Supervisor, which application she later withdrew.
liiOn December 12, 2010, a comprehensive layoff plan (which eliminated approximately 50 percent of the workforce) implemented by DHH became effective, pursuant to which Ms. O’Neal was demoted from a Public Health Nurse 5 to a Public Health Nurse 3. Prior to the implementation of said plan, on November 12, 2010, Ms. O’Neal had received a letter from the assistant secretary of DHH, informing all employees of the impending and proposed layoff plan being implemented as a result of the Fiscal Year 2011 budget reductions.
In response to that notice, on November 18, 2010, Ms. O’Neal wrote a letter to the secretary of DHH, Shannon Templet, and the assistant secretary, Clayton W. Williams. In that letter she expressed concern “as to how decisions were made with respect to positions being abolished which are similarly situated.” She then detailed that the plan would abolish her Public Health Nurse 5 position and offer her a demoted position of Public Health Nurse 3, while at the same time, another employee with less time of service was being offered a relocation position at the 5 level, rather than the 3 position offered to her. She stated that her civil service record speaks for itself; that she had never received unsatisfactory ratings; and she asked for their “review and consideration in this regard.”
On December 7, 2010, Ms. O’Neal was hand-delivered a detailed letter explaining the layoff, providing a relocation offer, advising her of her right to comment, and the opportunity to accept the layoff rather than the relocation position offered. She was advised she had until December 12, 2010, to turn in her application for the “new” position. Ms. O’Neal accepted the relocated position and continued to work, as a Public Health Nurse 3. (However, on January 7, 2011, Ms. O’Neal wrote a letter requesting the department to investigate the proposed layoff plan, alleging it violated civil service rules.)
On January 10, 2011, while working at the newly consolidated Metairie/Marrero Health Clinic, Ms. O’Neal, on three separate occasions, intentionally “bumped” the shoulder of an employee under her supervision with her shoulder, as the two passed each other in the hallway, stating, at least once, “you better believe it.” The employee felt threatened by Ms. O’Neal’s behavior, as reflected in a written incident report she turned in the next day.
*1242 |i,On January 12, 2011, Ms. Gray met with Ms. O’Neal and admonished her for engaging in aggressive and physically threatening behaviors with co-workers and also counseled her on how not to be defensive when receiving constructive criticism from her supervisors.
However, on February 28, 2011, yet another incident occurred, concerning Ms. O’Neal and an employee she supervised, Crystal Webb. Ms. Webb testified that she was walking down the hallway of the Marrero Health Clinic and was forced to turn around and go back into an office because Ms. O’Neal was coming up the opposite end of the hallway and completely blocking her passage. According to Ms, Webb, “there was no way for me to pass.” Ms. Webb testified that the next day, March 1, 2011, while working at the St. Bernard Health Unit, Ms. O’Neal did the same exact thing — intentionally blocking the hallway in an intimidating manner when she saw Ms. Webb approaching. The incidents upset Ms. Webb such that she wrote and submitted written documentation of them to her supervisor.
On May 19, 2011, at 8:53 a.m., Ms. O’Neal sent an email to Ms. Gray requesting four hours of annual leave for that day and the following day, May 20, 2011. Ms. Gray responded by email that same day at 10:10 a.m. denying her request for leave, advising her that she had recently been excessively requesting leave such that it was having an adverse impact on the clinic, and also informing her that she needed to schedule her activities more carefully. Ms. Gray further advised Ms. O’Neal that Ms. Graham, the other nurse to whom Ms. O’Neal had copied her request, was not authorized to approve Ms. O’Neal’s leave requests. Finally, she advised Ms. O’Neal that she would be leaving the office at 1:00 p.m. that day, and ordered Ms. O’Neal to submit a modified leave request before that time. At 11:29 a.m., Ms. O’Neal emailed Ms, Gray, basically stating that she would be leaving that day, as well as the following day to do the things she requested the leave for. She complained about the way Ms. Gray denied her leave request, stating that only her mother could treat her that way, but that even her mother had more “grace” than Ms, Gray. She also accused Ms. Gray of hating her, and again |7advised that notwithstanding the denial of her leave request, she was going to leave at 11:30 that day and at the same time the next day.
Ms. Gray responded by email at 12:08 p.m. notifying Ms. O’Neal that she was not authorized to leave, even without pay, that the clinic would be understaffed and that if she left anyway, without working something out with Ms. Graham to ensure that the clinic was covered, that such action would be considered insubordination. Despite this communication, Ms. O’Neal left her work shift that day at 12:15 p.m., without approval.
On May 25, 2011, Ms. O’Neal was mailed written notice of proposed disciplinary action (dismissal) as a result of her “repeated verbal and physically aggressive actions directed toward Office of Public Health (OPH) employees and leaving your work station without your supervisor’s approval.” The letter also detailed the aforementioned incidents. The letter noted that she had twice been counseled by her supervisors, and her duty station had also been changed twice as a result of her behavior and in attempts to alleviate the problems associated therewith, but no improvement or change had been shown. In fact, Ms. O’Neal had two more incidents of physical aggression toward coworkers, and on May 19, 2011, she left her work station without authorization.
On May 30, 2011, Ms. O’Neal responded to the proposed disciplinary notice by email to Ms. Gray, stating that she was *1243 “vehemently opposed” to the proposed action, claiming that decision was based on “false alleged allegations.” She further stated she believed her dismissal was in retaliation for her having initiated a civil service investigation on January 7, 2011, and by her expressed desire to apply for disability retirement.[4]
Nevertheless, by certified letter dated June 9, 2011, Ms. O’Neal was terminated from her position as a Public Health Nurse 3 effective June 17, 2011. The letter again advised Ms. O’Neal the dismissal was the result of her engaging in disruptive behavior and insubordination, and detailed the foregoing incidents.
| sAlso, by letter dated June 9/2011, from Patrick Lowery, Workforce Development Division Administrator, Ms. O’Neal was notified that a review had been undertaken of the layoff plan based on her previously submitted complaints. It was determined that the plan was limited to individual parishes, thus, Ms. O’Neal was not eligible for the position [the other employee] was relocated to because it was outside of Ms. O’Neal’s commuting area of Jefferson Parish. The letter also notified her that the layoff plan was implemented in compliance with all civil service rules and no further action or inquiry would be made in response to her complaints.
On July 8, 2011, Ms. O’Neal appealed her dismissal to the Civil Service Commission. She denied the allegations upon which her dismissal was based and alleged she was the victim of retaliation. She also included her earlier voiced complaints about the layoff plan and raised issues regarding her performance evaluations, as well as the effect her disability retirement application may have had on the department’s decision to terminate her.
On July 28, 2011, the Civil Service Commission referee to whom the case was assigned, Brent C. Fredrick, issued a notice to Ms. O’Neal giving her fifteen days to amend her appeal and/or to show cause why the claims, regarding the December 2010 layoff plan, her performance evaluations, and her disability retirement applications, should not be dismissed for failure to state a right to appeal those items to the Commission. Ms. O’Neal failed to respond, and on September 19, 2011, the referee dismissed those claims from the appeal.
Hearings were held on January 30, 2012 and on April 24, 2012, on the merits of Ms. O’Neal’s appeal of her dismissal. On June 22, 2012, the referee issued a detailed written decision, finding that DHH proved legal cause for Ms. O’Neal’s disciplinary action and also finding that the penalty imposed — dismissal—was commensurate with the offenses.
On July 6, 2012, Ms. O’Neal appealed the referee’s decision to the Civil Service Commission, alleging in a twelve-page letter that the decision was “in direct opposition to state civil service rule of law,” rendering it manifestly erroneous and characterized by an |flabuse of discretion. She continued to claim that all of the incidents alleged did not occur and that all allegations against her are false. She also alleged the referee gave credit only to the state’s witnesses and completely disregarded any of her witnesses.
On August 2, 2012, the Civil Service Commission, with David Duplantier, Chairman, issued written notification to Ms. O’Neal that her application for appeal was being denied, and the decision of the referee was thereby final. This appeal, filed on *1244 behalf of Ms. O’Neal on August 21, 2012, followed.
APPLICABLE LAW
Appellate courts reviewing civil service disciplinary cases are presented with a multifaceted review function. Initially, deference should be given to the factual conclusions of the civil service commission. A reviewing court should apply the clearly wrong or manifest error rule prescribed generally for appellate review. Then, the court must evaluate the commission’s imposition of a particular disciplinary action to determine if it is both based on legal cause and is commensurate with the infraction; the court should not modify the commission’s order unless it is arbitrary, capricious, or characterized by abuse of discretion. “Arbitrary or capricious” means the absence of a rational basis for the action taken, “abuse of discretion” generally results from a conclusion reached capriciously or in an arbitrary manner. Crawford v, Southern University-Baton Rouge Campus, 2010-1169, p. 2 (La.App. 1 Cir. 2/11/11), 57 So.3d 612 (unpublished), citing Mathieu v. New Orleans Public Library, 2009-2746, pp. 5-6 (La.10/19/10), 50 So.3d 1259, 1262-63.
Employees with permanent status may be disciplined only for cause expressed in writing. La. Const art. X, § 8(A), “Cause” for dismissal of such a person includes conduct prejudicial to the public service involved or detrimental to its efficient operation. Mathieu, 50 So.3d at 1262.
Civil service laws and rules establish a system under which “non-policy forming” public employees are selected on the basis of merit and can be discharged only for insubordination, incompetency, or improper conduct. Equally as important as protection of the employees is the appointing authority’s duty to undertake disciplinary action h0against an employee for legal cause that impairs the efficiency of the public service. Just as great an injustice may arise from suffering the continuance of incompetent or insubordinate classified civil service employees in then-positions as from wrongfully terminating the permanently classified civil service employee. Both concerns are fundamental to the purpose of the civil service merit system. Id. (citations omitted).
DISCUSSION AND ANALYSIS
Notwithstanding Ms. O’Neal’s contentions to the contrary, we have reviewed the record in its entirety and find that it amply establishes the factual incidents of Ms. O’Neal’s behavior as described earlier in this opinion. Ml of the testimony presented by the persons involved in those incidents, either first-hand or as eyewitnesses,[5] was consistent and wholly supports that those incidents occurred as described. The only evidence presented to the contrary was that of Ms. O’Neal herself, who, despite the abundance of evidence presented, continued to deny that any of those incidents occurred in the manner described. In addition to testimony regarding the specific facts and circumstances related to those incidents, the following testimony regarding Ms. O’Neal, generally, as an employee was elicited, which we find, also, wholly supports the findings and conclusions of the referee and the Commission's decision to deny the appeal.
Jacqueline Shields was Ms. O’Neal’s supervisor during April 2009, through sometime around April or May 2010. She testified that during the time she supervised *1245 Ms. O’Neal, there was a lot of tension between the two of them. She testified that she felt “challenged” by Ms. O’Neal and that she also received complaints from her clerical staff about Ms. O’Neal being a “bully” and speaking-abusively to other employees. Ms. Shields conducted an investigation into the complaints regarding Ms. O’Neal, that she submitted to the ultimate supervisor, Dr. Davis, by email on April 19, 2010. That two-page report contains very detailed lists of various complaints regarding Ms. O’Neal’s aggressive and bullying behavior and demeanor in the workplace.
|n Also, providing testimony was Dr. Ta-keisha Davis, the Regional Medical Director in Region 1 for the Office of Public Health, and who was also Ms. O’Neal’s direct supervisor at two different periods of time during Ms. O’Neal’s employment with the agency. She testified regarding her first-hand knowledge of there having been incidents involving Ms. O’Neal and Ms. Davis, as well as Ms. O’Neal and Ms. Gina Anderson, over which she had been required to counsel Ms. O’Neal. She testified at one time the decision was made to move Ms. O’Neal to the Delgado Personal Health Clinic for approximately thirty days, primarily due to the complaints being received by other employees about Ms. O’Neal’s threatening behaviors and their fears of having to continue to work around her.
We, further, find no merit to Ms. O’Neal’s contentions that the referee credited only the testimony of the state’s witnesses and completely ignored the testimony of her witnesses. Our review of the record reveals that Ms. O’Neal presented the testimony of Deidre Pierre, a co-worker who testified that she found Ms. O’Neal to be a nice, professional, laid back coworker. However, upon further questioning, it was revealed that Ms. Pierre did not really know Ms. O’Neal very well, and she ultimately admitted that she had only seen her three or four times during the years 2007 through 2010. She also presented the testimony of co-worker nurse practitioner Eden Tablan, who also testified that Ms. O’Neal was cordial and acted professionally as a nurse; however, she too, admitted that she actually spent very little time with Ms. O’Neal when they were working, and usually just saw her when she was leaving and said “good night.” Finally, the last witness testifying for Ms. O’Neal was another co-worker, Deidre Porter, who was supervised by Ms. O’Neal. She testified that she had no problems with Ms. O’Neal, that she respected her as a supervisor, and that she did whatever Ms. O’Neal told or asked her to do. However, she too, admitted that she was not with Ms. O’Neal during the entire work day, and that she did not witness the relationships and encounters that Ms. O’Neal had with others. Significantly, none of these witnesses was questioned about any of the specific incidents forming the basis for Ms. O’Neal’s dismissal. Thus, there is no merit to the contention that the referee ignored or even discredited Ms. O’Neal’s evidence. The | ^record reveals that the evidentiary weight of their testimony of her witnesses, based on their minimal contacts with Ms. O’Neal, was marginal at best. More importantly, they did nothing to minimize or contradict the other direct evidence establishing the egregiousness of Ms. O’Neal’s conduct at the workplace on more than one occasion.
We also find no merit to Ms. O’Neal’s contention that the referee erred in dismissing her claim regarding the December 2010 layoff plan. Ms. O’Neal asserts that she “appealed” the layoff plan on November 18, 2010, only two days after having received notice of such. Civil Service Rule 13.12 allows thirty days after which a person receives written notice of *1246 an action to appeal that action. On June 9, 2011, the Commission responded to Ms. O’Neal’s complaints about the layoff plan, informing her that it was implemented in compliance with all civil service rules and that none of her complaints were warranted. Ms. O’Neal did not seek review (appeal) of the Commission’s June 9, 2011 decision. Ms. O’Neal did appeal her termination, which became effective on June 17, 2011, on July 8, 2011. In that appeal, Ms. O’Neal re-asserted her challenges to the layoff plan. However, this “appeal” of the layoff plan was made more than six months after the effective date of the layoff, and more than thirty days after receiving the decision of the Commission regarding her first-lodged complaints. Ms. O’Neal does not cite, nor do we know of, any authority that would allow her a second chance to appeal the decision concerning the layoff on conjunction with her appeal of her termination. Nor has she otherwise shown how the referee erred in dismissing those claims from this appeal. Accordingly, this assignment also Jacks merit.
With regard to Ms. O’Neal’s complaints about alleged improprieties in her performance evaluations, we simply note that Civil Service Rule 13.10 governs which persons and what circumstances warrant an appeal to the Commission, and the appeal of an employee’s performance planning review is simply not within the Commission’s appellate jurisdiction.
The remaining assignments of error contest the referee’s conclusion that Ms. O’Neal’s dismissal was based on legal cause. The record before us is replete with evidence establishing an ongoing and persistent problem in the workplace resulting from 11sMs. O’Neal’s aggressive, threatening, abusive, unprofessional, and bullying behavior, which more than amply provides a basis to warrant termination. Additionally, the record fully supports that Ms. O’Neal was guilty of insubordination on May 19, 2011, when she intentionally, knowingly, and voluntarily left her work station without the approval of her supervisor. Moreover, in addition to all the evidence supporting termination, the record reflects that on more than one occasion, the department counseled Ms. O’Neal, and even relocated her, in attempts to alleviate the problems caused by her attitude and behavior. Not only were these counseling sessions unsuccessful, the record reveals Ms. O’Neal continued to have incidents whereby other employees felt abused, harassed, and threatened by her.
CONCLUSION
Accordingly, for all the foregoing reasons, we find no merit in this appeal. The record amply supports the conclusion reached by the referee and affirmed by the Commission. Therefore, that decision is hereby affirmed. Costs of this appeal are assessed to the appellant, Marsha O’Neal.
AFFIRMED.

. We note that the appellant references the "trial court” when in fact, it was the State Civil Service Commission.

. Ms. Lisa Davis was the supervisor of the clerical staff; Ms. O’Neal was the supervisor of the nursing staff. They did not supervise or have authority of one another; their employment relationship was described as "collaborative.”

. Ms. Davis admitted that she was later "written up" for the first time in her employment with DHH, for leaving the meeting against the wishes of Ms. Triggs, but she testified that Ms. O'Neal was being childish and carrying on about the printer incident from the previous week, and she could not take anymore and did not feel Ms. O'Neal was going to allow anyone else to speak.

. On June 6, 2011, Ms. O’Neal submitted a second application for disability retirement benefits to Ms. Gray, who signed the application on June 9, 2011, and the application was formally submitted on June 14, 2011.

. This evidence includes the testimony of Rosalind Hawkins, Lisa Davis, Crystal Webb, Leona Anderson Jacqueline Shields, Dr. Ta-keisha Davis, Mary Triggs, Gina Anderson, and Avis Gray.